UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL No. 20-10217-DJC |
| KAYLA NIGHTINGALE | |
| Defendant | |

SENTENCING MEMORANDUM

On April 2, 2019, a confidential source ("CS") tragically died of a drug overdose in Wareham, Massachusetts. Those drugs were provided by the Defendant, Kayla Nightingale. In the months leading up to this tragic event, Nightingale and her co-defendant, Troy Jones, provided drugs to the CS on at least four other occasions. They dealt these drugs from the home that they shared. Under the factors outlined in 18 U.S.C. § 3553(a) and in consideration of United States Sentencing Guidelines ("USSG") § 5K2.1, the Government is recommending that the Court impose a sentence of 60 months of incarceration followed by 36 months of supervised release.

Procedural Background

On September 29, 2020, a grand jury returned an indictment charging Jones and Nightingale with conspiracy to distribute and to possess with the intent to distribute fentanyl resulting in death, in violation of 21 U.S.C. § 846, and distribution of fentanyl resulting in death, in violation of 21 U.S.C. § 841. (Doc. No. 1). On August 29, 2024, the parties executed a plea agreement pursuant to Rule 11(c)(1)(B) ("the Plea Agreement") in which the government agreed to dismiss so much of counts one and two as alleged that death resulted from the crimes charged in those counts. (Doc. No. 180). On August 29, 2024, Nightingale entered a guilty plea to so

much of the two-count indictment as charged conspiracy to possess with intent to distribute
fentanyl (count one) and distribution of fentanyl (count two). (Doc. No. 181). The Court deferred
acceptance of the plea agreement pending preparation of a written Presentence Report ("PSR").

<u>The Conspiracy</u>

The Court is familiar with the facts of this case, and they will not be recounted in full
herein. In late January 2019, the DEA was contacted by the CS about a fentanyl dealer in
Wareham, Massachusetts. The CS advised that Jones was dealing fentanyl out of his residence at
44 Barker Road in Wareham. The CS further advised that Nightingale lived at the residence too.

At the direction of the DEA, the CS made four, approximately ten gram controlled
purchases of fentanyl from 44 Barker Road on February 6, February 21, March 11, and March 28,
2019 for a total of approximately 34.1 grams. The first three controlled purchases were made from
Jones. The final controlled purchase on March 28, 2019, was made from Nightingale. During a
review of the audio recording device that the CS was provided by law enforcement for the
controlled purchase, Nightingale was heard discussing what the CS wanted, confirming the price,
and making other statements related to narcotics. Additionally, location information for Jones's
cellular phone confirmed that Jones was not present for this controlled purchase.

In addition, as part of the investigation, law enforcement identified another drug customer
of Jones and Nightingale. At the time of the conspiracy charged in the indictment, this drug
customer regularly bought what she thought was heroin from Jones and Nightingale. This
customer advised law enforcement that she dealt with Jones and Nightingale interchangeably
during the narcotics transactions.

<u>The Death</u>

Sadly, the CS suffered a relapse in late-March and early-April and began purchasing fentanyl from Jones and Nightingale for his own personal use.  The day before the CS's death, on April 1, 2019, the CS, after contacting Jones and Nightingale multiple times, travelled with his father to Rockland Trust in Wareham, Massachusetts, to withdraw $200.  The CS's father then brought the CS to 44 Barker Road, in Wareham, Massachusetts, to provide the money to Jones.  According to location information, Jones was present at 44 Barker Road and Nightingale arrived home at approximately 9:54 a.m. that morning.

The following day, on April 2, 2019, the CS called Jones and Nightingale multiple times and then the CS's father again travelled with the CS to Rockland Trust where the CS's father withdrew $200 at approximately 9:54 a.m.  The CS's father provided the CS with money and then brought the CS to 44 Barker Road where the CS's father waited in his vehicle while the CS entered the Jones's residence with the money to purchase narcotics.  Location information for Nightingale's cellular phone showed that Nightingale was present at the residence during this meeting.  Location information for Jones indicated that Jones was on Cape Cod at the time of this meeting and was not present.  Accordingly, on this date, the CS purchased narcotics from Nightingale.  The CS's father then brought the CS home from 44 Barker Road.  Later that evening, the CS was found at his home unresponsive on his knees slouched over in a spare bedroom.  The CS died of a fentanyl overdose.

<u>The Search Warrant and Additional Investigation</u>

The following day, on April 3, 2019, law enforcement executed a search warrant at 44 Barker Road.  Inside of the residence, investigators found a digital scale, a scale calibration weight, a cutting agent and multiple sandwich/corner cut baggies consistent with the earlier controlled

purchases.  On Nightingale's person, law enforcement recovered less than a gram of a mixture and substance containing fentanyl.  Investigators also seized Nightingale's cell phone.

<u>The Pre-Sentence Report and the Government's Request for an Upward Departure</u>

The probation office has prepared a PSR, which tracks the calculation of the sentencing guidelines set forth in the Plea Agreement.  The applicable guideline is USSG § 2D1.1.  The base offense level is 22, because the defendant is responsible for distributing 34.26 grams of fentanyl during the controlled buys.  USSG § 2D1.1(c)(9).  Nightingale is also entitled to a three-level reduction for acceptance of responsibility.  USSG § 3E1.1.  With a total offense level of 19 and a criminal history category ("CHC") of III, the applicable guideline sentencing range is 37 to 46 months imprisonment.

The PSR identifies a ground for both an upward and downward departure as to Nightingale. First, the PSR notes that USSG § 5K2.1 provides a basis for an upward departure from the advisory guideline range because a death resulted from the offense.  Second, the PSR notes that USSG § 5H1.1 provides a basis for a downward departure based upon the Defendant's youthfulness at the time of her prior offenses, among other factors.

On December 11, 2024, Jones was sentenced to 92 months in prison in this case based upon the same charges.  Unlike Nightingale, Jones pled guilty to a plea agreement pursuant Federal Rule of Criminal Procedure 11(c)(1)(C).  Jones's plea agreement included a two-level enhancement because Jones was an organizer, leader, manager, or supervisor in the criminal activity, pursuant to USSG § 3B1.1(c).  Jones's guideline range at sentencing was 46-57 months.  The Government recommended a sentence of 120 months, which represented the middle of the guidelines after an 8-level departure, pursuant to USSG § 5K2.1.  Jones requested a sentence of 72 months.  Jones ultimately received a sentence of 92 months.

The Government is seeking a four-level upward departure for Nightingale, pursuant to USSG § 5K2.1, to 60 months in prison. A sentence of 60 months is at the low-end of the guidelines range after a four-level departure, which would result in a range of 57 to 71 months. However, even if the Court were to treat the Defendant as a CHC II based upon the nature and age of her prior convictions, 60 months would fall within that range as well, which would be 51 to 63 months. The departure contemplated by the Government in this case as to Nightingale is significantly lower than other narcotics cases where death resulted. See, e.g., United States v. Carvajal, 85 F.4th 602, 613-14 (1st Cir. 2023) (GSR of 51 – 63 months, sentence of 120 months, 8-level upward departure); United States v. McKinnie, 21 F.4th 283, 288 (4th Cir 2021) (GSR of 21 – 27 months, sentence of 120 months, 15-level upward departure); United States v. Heindenstrom, 946 F.3d 57, 61 (1st Cir. 2019) (GSR of 8 – 14 months, sentence of 60 months, 14-level upward departure, although affirmed as a variance); United States v. Waver, 754 F. App'x 56, 57 (2d Cir. 2019) (GSR of 33 – 41 months, sentence of 84 months, eight-level upward departure, although affirmed as a variance); United States v. Nossan, 647 F.3d, 822, 825 (8th Cir. 2011) (GSR of 10 – 16 months, sentence of 60 months, 12-level upward departure); United States v. Bollinger, 893 F.3d 1123, 1124 – 25 (8th Cir. 2018) (GSR of 6 – 12 months, sentence of 130 months, 22-level upward departure). It is also significantly lower than what the Government recommended for Jones.

Under USSG § 5K2.1, after the Court finds that an upward variance is warranted, the extent of the increase should depend on the following: 1) the dangerousness of the defendant's conduct; 2) the extent to which death or serious bodily injury was intended or knowingly risked; and 3) the extent to which the offense level for the offense of conviction already reflects the risk of personal injury. A four-level departure is not only reasonable based upon consideration of these three

factors but it is also appropriate to account for Nightingale's conduct in causing a death, which otherwise is not accounted for in her guidelines.

Sentencing Recommendation

Even if the Court were to deny the Government's motion for an upward variance pursuant to USSG § 5K2.1, or choose not to depart to the extent requested by the Government, the factors contained in 18 U.S.C. § 3553(a) support a variance above the advisory guidelines range. Specifically, consideration of factors including the nature and seriousness of the offense, the need for punishment, and the need for general deterrence, each support the Government's recommended sentence of 60 months. A life was lost based on the choice that Nightingale made on April 2, 2019. Nightingale knowingly undertook a risk when she chose to distribute drugs to the CS and her sentence should reflect the serious consequences of taking such risks with other people's lives. While it is not disputed that Nightingale provided the drugs to the CS at the direction of Jones, it was still Nightingale's choice to provide those drugs and it was Nightingale's actions that ultimately led to his death. The sentence in this case must account for both of those things— Nightingale's actions in causing the death of the CS, and Nightingale's role in the overall conspiracy relative to Jones.

Turning first to the Defendant's conduct in this case, Nightingale resided at 44 Barker Road with her now-husband and co-defendant Jones. From that residence, they both dealt drugs. We know that not only from the CS, but also from the other drug customer who was interviewed by law enforcement and advised that she purchased drugs from Nightingale and Jones interchangeably. Of the four controlled purchases conducted during this investigation, the final controlled purchase on March 28, 2024, was conducted by Nightingale—not Jones. It was Nightingale who provided fentanyl to the CS in exchange for money and it was Nightingale who

discussed what narcotics the CS wanted, confirmed the price, and made other statements related to narcotics on the audio recording from the controlled purchase.

Furthermore, when a search warrant was ultimately executed at 44 Barker Road following the CS's death, inside of the residence law enforcement found tools of the drug trade, including a digital scale, a scale calibration weight, a cutting agent, and corner-cut bags consistent with earlier purchases. On Nightingale's person, law enforcement recovered less than a gram of fentanyl. While Nightingale and Jones were not large-scale drug traffickers, they were dealing small quantities of drugs out of the residence that they shared and by doing this, they were putting their community at risk.

Most importantly, Nightingale provided the narcotics to the CS on April 2, 2019. Based on the sequence of communications on the day of the CS's death (April 2), the CS communicated with both Jones and Nightingale that morning presumably to coordinate a meeting to purchase narcotics before travelling to the bank. While the communications indicate that Nightingale was not necessarily in charge of the drug trafficking taking place out of her home, she undoubtedly knew what she was involved in and made the decision on more than one occasion to deal drugs. The decision that she made on April 2, 2019 to provide drugs to the CS cannot be viewed as an aberration or as a one-off event since the investigation demonstrated that Nightingale had dealt drugs on at least one other occasion to the CS, and on other occasions to the other drug customer identified in this investigation. Any time a drug dealer distributes fentanyl, they run the risk that a user will fatally overdose. Nightingale was intimately familiar with this risk as a drug user herself. Nightingale knew the dangers and still chose to endanger the lives of other people.

This danger was especially pronounced since Nightingale and Jones were engaged in the distribution fentanyl, which is an extremely potent and dangerous drug. As the Court is aware,

fentanyl is a deadly drug that has wreaked havoc in Massachusetts and beyond over the past several years. "Fentanyl is the deadliest drug threat the United States has ever faced, killing nearly 38,000 Americans in the first six months of 2023 alone. Fentanyl and other synthetic drugs, like methamphetamine, are responsible for nearly all of the fatal drug overdoses and poisonings in our country."[1] These grim statistics are not hypothetical – they describe the opioid overdose crisis occurring right now in this country and in this district – an epidemic that has lasted years and that will be felt far into the future. The epidemic is real and being felt every day by families across Massachusetts and New England, including the CS's own family in this case. Nightingale's crimes played a role in fueling this epidemic and caused the death of another individual.

There is a need for the punishment in this case to account for Nightingale's conduct and her role in the CS's death. The advisory guidelines range of 37-46 months only take into account the narcotics foreseeable to the conspiracy. This range does not account for the lost life that is central to this case. The death of the CS should be reflected in the sentence imposed by the Court. The Court should also consider the potential penalties had the United States not agreed to dismiss the portion of the charges related to the allegation that a death resulted, as they carried a twenty-year mandatory minimum sentence and a maximum term of life. This statutory regime shows the seriousness with which Congress chose to treat instances of narcotics trafficking that result in death. Instead, Nightingale and Jones pled guilty to charges that carry a statutory maximum of twenty years and did not receive any enhancement to account for the death that resulted from their

---

[1] U.S. Department of Justice Drug Enforcement Administration, *2024 National Drug Threat Assessment*, available at https://www.dea.gov/sites/default/files/2024-05/5.23.2024%20NDTA-updated.pdf., at 1(last visited August 12, 2024) (hereinafter "DEA 2024 Assessment").

shared actions. However, that fact should be taken into consideration in determining the appropriate sentence.

Nightingale's history and characteristics are also reflected and taken into account in the Government's recommendation. First, the Government recognizes that Nightingale's criminal history is old and that it is consistent with that of a drug user. However, clearly that conduct escalated to dealing as evidenced by this case. The Government also recognizes that while Nightingale is a CHC III, she has not previously served time in prison and that she has struggled with drug addiction since a young age. Second, the Government also credits the improvements that Nightingale has made to herself and her life since her arrest in this case. Both of those factors are accounted for, as well as her relative role in the offense, in the Government's recommendation to sixty months. Again, this is a significantly lower sentence than the Government requested for Jones even though it was Nightingale that provided the narcotics on the day of the CS's death.

Finally, a significant sentence of imprisonment is warranted to deter others from becoming involved in the trafficking of fentanyl. Based on the facts of this case, it is abundantly clear that fentanyl kills people, and those that choose to sell it are putting lives at risk every day. The CS's family has been deeply impacted by the choices of Jones and Nightingale that culminated in the death of their son, their brother, and their friend in April 2019. As the family wrote in their letter to the Court, "Not a day goes by that we do not think about or miss him. Not a holiday passes, that we don't miss his presence and feel the sadness of our loss. We loved him as he did us." No family should have to go through what the CS's family went through and until others understand the consequences and the risks associated with engaging in this conduct, families across Massachusetts and the broader United States will continue to deal with the same grief that the CS's

family has gone through on a daily basis since 2019. Imprisonment is necessary to send a strong warning to others who might otherwise consider distributing this dangerous drug.

Conclusion

The government's recommendation of 60 months reflects the seriousness of the offense, the need to punish conduct that resulted in the death of the CS, and the need for general deterrence. The Court should sentence Jones to 60 months imprisonment, 3 years of supervised release, and order that restitution should be paid as reflected in the PSR.

Respectfully submitted,

JOSHUA S. LEVY
United States Attorney

By:    /s/ J. Mackenzie Duane
J. MACKENZIE DUANE
JARED C. DOLAN
Assistant United States Attorney

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ J. Mackenzie Duane
J. Mackenzie Duane
Assistant United States Attorney

Date: January 13, 2025